IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

PAULA W. GORDON,

        Plaintiff,

        v.                           Civil Action No. 5:06-CV-101

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I. Introduction

A.    Background

      Plaintiff, Paula W. Gordon, (Claimant), filed her Complaint on August 21, 2006, seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) and 1381(c)(3) of an adverse decision by

Defendant, Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer

on February 20, 2007.[2]  Claimant filed her Motion for Summary Judgment on April 25, 2007.[3]

Commissioner filed his Motion for Summary Judgment on May 29, 2007.[4]  Claimant thereafter

filed her Reply to the Commissioner's Motion on June 12, 2007.  Finally, Claimant filed a

Motion for Remand for Consideration of New Evidence on July 12, 2007 [5] and Commissioner

---

[1] Docket No. 1.

[2] Docket No. 11.

[3] Docket No. 16.

[4] Docket No. 21.

[5] Docket No. 22.

filed his Response on August 22, 2007.[6]

B.     The Pleadings

   1.     Claimant's Motion for Summary Judgment.

   2.     Commissioner's Motion for Summary Judgment.

   3.     Claimant's Motion for Remand for Consideration of New Evidence.

   4.     Commissioner's Response to Plaintiff's Motion for Remand.

C.     Recommendation

   I recommend that:

   1.     Claimant's Motion for Summary Judgment be DENIED.

   2.      Commissioner's Motion for Summary Judgment be GRANTED.  First, the ALJ's decision that Claimant's achilles heel impairment did not meet Listing 1.03 is supported by substantial evidence in the record.  As established by the evidence, Claimant suffered injuries to her achilles heel but was not otherwise unable to ambulate effectively for a period of 12 months.  Second, the ALJ properly determined Claimant's RFC after complying with the two-step process set forth in Hines and after considering the degree to which Claimant's subjective symptoms were consistent with the medical evidence.  Finally, the ALJ's hypothetical presented to the ALJ properly contained all those limitations supported by the medical evidence.

   3.     Claimant's Motion for Remand be DENIED.  Although LP Gen P 83.12(d) bars the introduction of the new evidence submitted by Claimant, this Court - if asked to evaluate the evidence - concludes Claimant had "good cause" for failing to submit the evidence at the time of the prior proceeding and that the reports presented "new" evidence.  However, this Court also

_____

[6] Docket No. 27.

finds that the reports were not "material," because there was not a reasonable possibility the reports would have changed the outcome at the hearing.

## II.  Facts

A.    Procedural History

Claimant filed an application for Supplemental Security Income Benefits and Disability Insurance Benefits on April 3, 2004, alleging disability since September 25, 2001.[7] Her applications were initially denied on August 11, 2004 and upon reconsideration on February 2, 2005.  Claimant requested a hearing before an Administrative Law Judge, ["ALJ"], and received a hearing on January 3, 2006.  On February 27, 2006, the ALJ issued a decision adverse to Claimant.  Claimant requested review by the Appeals Council but was denied.  Claimant filed this action, which proceeded as set forth above.

B.    Personal History

Claimant was 36-years-old on the date of the January 3, 2006 hearing before the ALJ. Claimant completed high school and one year of LPN school and has prior work experience as a retail sales clerk, practical nurse, and volunteer firefighter.

C.    Medical History

The following medical history is relevant to the time period during which the ALJ concluded Claimant was not under a disability: September 23, 2002[8] through February 27, 2006.

---

[7] Claimant filed a prior application for supplemental security income benefits and disability insurance benefits on January 9, 2003.  The applications were denied initially on March 6, 2003 and upon reconsideration on April 25, 2003.  No further appeal was filed by Claimant.  (Tr. 16).

[8] Claimant originally alleged an onset date of disability of September 25, 2001.  As she explained at the hearing, this date is the date she reinjured her Achilles tendon while working at

**Robert Cunanan, M.D., 3-26-02 (Tr. 156)**
Examination of the right ankle shows evidence of previous surgery along the posterior aspect of the calcaneus. Multiple small soft tissue calcifications opposite the posterior aspect of the calcaneus are also noted. Otherwise the visualized bones appear essentially intact. The ankle mortise is maintained. There is a small spur along the undersurface of the calcaneus. There is no bony destructive process. Soft tissue swelling opposite the lower shaft of the fibula is noted.

**Dr. Diego Poineman, M.D., 12-16-02 (Tr. 163)**
Assessment:
1. Health maintenance. The patient needs a PAP smear within the next 3-6 months.
2. Status post tear on the right side of the Achilles tendon. The patient is waiting for her appointment with a specialist.
3. Bilateral ankle pain. We will continue current treatment. Continue physical therapy.
4. Depression. The patient is not suicidal. Continue with the Zoloft through the Sharing and Care free medication program.
5. Return to the clinic in about 4-6 weeks. The patient can come before on a PRN basis.

**Dr. Diego Poineman, M.D., 10-25-02 (Tr. 164)**
Assessment:
1. Health maintenance. Up to date.
2. Status post tear on the right side of the Achilles tendon.
3. Bilateral ankle pain. We will start patient with physical therapy. Patient underwent counseling in Morgantown with Orthopedics and we couldn't get any results back. The patient was given some braces to use. She states that the pain is not worse since the last time I saw her on 10-1-02.
4. Depression. We will continue with SSRI. Patient states that she doesn't have any money to cover the Paxil. We will give her some Zoloft through the Sharing the Care Program. We will be following the patient.

**Dr. Diego Poineman, M.D., 10-1-02 (Tr. 165)**

--------------------------------

Fairmont Hospital and as a result was also the last day she was able to work. (Tr. 168, 409). At the hearing, the Administrative Law Judge, ["ALJ"], noted that Claimant reported on her Work History Report (dated January 22, 2003) she last worked at Fairmont Hospital in August 2002. The ALJ concluded Claimant had been mistaken about the September 25, 2001 date of onset and elected to amend the complaint to reflect an onset date of September 23, 2002. This Court finds the ALJ's election was in error, because all other documents pertaining to the date of Claimant's reinjury indicate Claimant reinjured her tendon in September 2001 and merely mistakenly entered the year 2002 in her Work History Report. (See Dr. Thrush's notes dated September 27, 2001, Tr. 168; see, also, Tr. 83, establishing that Claimant last worked at Fairmont Hospital in 2001). This Court does not find the ALJ's error mandates remand, however, because the ALJ's amendment did not affect her ultimate decision. Rather, the ALJ continued to examine all the medical evidence in the record, including records from 2001. (Tr. 23). Additionally, the ALJ did not see the amendment as bearing negatively on Claimant's credibility.

Assessment:
1. Health maintenance. Up to date.
2. Status post tear on the right side, now complaining of left sided pain. We will send the patient for an evaluation to an orthopedic surgeon. I will be following along with the specialist.
3. Return to clinic in 2-3 weeks. The patient is advised to bring all her medications on the next visit.
4. Depression. The patient denies that she is suicidal. She states that she is depressed secondary to being unable to work. We will be following with the patient's medication and will adjust them as needed.

**Dr. Diego Poineman, M.D., 9-23-02 (Tr. 166)**
Assessment:
1. Health maintenance. Deferred.
2. Status post tear on the right side of the Achilles tendon, status post operative repair. Apparently patient was told by her previous physician that she had achieved her maximal degree of improvement.
3. Depression. Patient denies any suicidal ideations. We'll continue to follow the patient. Patient will need to bring her medications on next visit. We might adjust her medications accordingly.
4. Liquid panel, CBC, and TSH.

**Dr. Katherine Jacoby, M.D., 1-15-03 (Tr. 181)**
Diagnosis:
Axis I: Major Depressive Disorder, single episode, severe, chronic without psychotic features.
Axis II: Deferred.
Axis III: Achilles tendon rupture.
Axis IV: Chronic health problems, inability to perform physically as she once did, poor social support.
Axis V: GAF 55

**DDS Physician, 3-4-03 (Tr. 196)**
Physical RFC Assessment
Exertional Limitations
       Occasionally - 20 pounds
       Frequently - 10 pounds
       Stand and/or walk - at least 2 hours in an 8 hour workday
       Sit - about 6 hours in an 8 hour workday
       Push and/or pull - unlimited, other than as shown for lift and/or carry
Postural Limitations
       Occasionally - climbing, balancing, stooping, kneeling, crouching, crawling
Manipulative Limitations: none established
Visual Limitations: none established
Communicative Limitations: none established
Environmental Limitations: Avoid concentrated exposure of extreme cold and hazards.
Symptoms: Are attributable, in your judgement, to a medically determinable impairment.

Comments: Recovered with shuffling gait, all considered. RFC reduced to sedentary because of obesity, pain and fatigue.

**DDS Physician, 3-5-03, (Tr. 204)**
Psychiatric Review Technique
Medical Dispositions: impairments not severe
Categories upon which the medical disposition is based: affective disorders
A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: depression.
Rating of Functional Limitations
       Restriction of Activities of Daily Living: Mild
       Difficulties in Maintaining Social Functioning: Mild
       Difficulties in Maintaining Concentration, Persistence or Pace: Mild
       Episodes of Decompensation, Each of Extended Duration: None
"C" Criteria of the Listings: Evidence does not establish the presence of the "C" Criteria.

**DDS Physician, 4-23-03 (Tr. 218)**
Physical RFC Assessment
Exertional Limitations
       Occasionally - 20 pounds
       Frequently - 10 pounds
       Stand and/or walk - at least 2 hours in an 8 hour workday
       Sit - about 6 hours in an 8 hour workday
       Push and/or pull - unlimited, other than as shown for lift and/or carry
Postural Limitations
       Occasionally - climbing, balancing, stooping, kneeling, crouching, crawling
Manipulative Limitations: none established
Visual Limitations: none established
Communicative Limitations: none established
Environmental Limitations: Avoid concentrated exposure of extreme cold and hazards.
Symptoms: RFC reduced to light.

**DDS Physician, 8-2-04, (Tr. 254)**
Psychiatric Review Technique
Medical Dispositions: No medically determinable mental impairment
A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: depression.
Rating of Functional Limitations
       Restriction of Activities of Daily Living: Mild
       Difficulties in Maintaining Social Functioning: Mild
       Difficulties in Maintaining Concentration, Persistence or Pace: Mild
       Episodes of Decompensation, Each of Extended Duration: None
"C" Criteria of the Listings: Evidence does not establish the presence of the "C" Criteria.

**DDS Physician, 8-13-04 (Tr. 268)**

Physical RFC Assessment

Exertional Limitations

       Occasionally - 50 pounds

       Frequently - 25 pounds

       Stand and/or walk - at least 6 hours in an 8 hour workday

       Sit - about 6 hours in an 8 hour workday

       Push and/or pull - unlimited, other than as shown for lift and/or carry

       Supportive evidence: Remote repair of right achilles tendon repair (2000). The claimant continued to have pain on the right and later developed pain on the left which was diagnosed with tendinosis. Due to the persistent pain there is a question of complex regional pain syndrome. She had an adverse reaction to ___. She is still having pain and swelling. She is now walking with a normal gait. Muscle strength is 5/5 and SCR is neg. Right ankle joint movement less restricted.  She is 5'7" and weighs ___.  Full range of motion.

Postural Limitations

       Frequently - climbing (ramp/stairs), balancing, stooping, kneeling, crouching, crawling

       Occasionally - climbing (ladder/rope/scaffolds)

Manipulative Limitations: none established

Visual Limitations: none established

Communicative Limitations: none established

Environmental Limitations: Avoid concentrated exposure of hazards.

Symptoms: No problem with ambulation. RFC reduced. Pain and fatigue considered. Claimant is partially credible.

**Dr. Carl Hasselman, M.D., 11-23-04, (Tr. 300)**

Assessment: I think she does have a classic story for meniscal tear.  Under sterile conditions today I injected her knee with cortisone and lidocaine.  She tolerated this well.  I will just see her back in about 3 weeks.  I told her no significant bending of the knee.  I think she will do well. I will just see her back then.

**Dr. Papas, 4-7-04, M.D., (Tr. 305)**

Assessment: Persistent pain in both feet over the Achilles tendon region. I question whether or not she is developing some complex regional pain syndrome in the right foot.

Plan: She is not ready to return yet to work.

**Dr. Papas, 2-25-04, M.D., (Tr. 306)**

Assessment/Plan: The patient will begin weightbearing as tolerated with an Aircast Cam Walker over the next 6 weeks.  She will go to therapy for gentle range of motion exercises for the right ankle.  She also has been treated in the past for Achilles tendinosis of the left ankle.  She is going to start a physical therapy program there as well.  I will see her back in 6 weeks, to examine her and see if she is able to get out of the brace after that point.

**Dr. Papas, 2-6-04, M.D., (Tr. 307)**

Assessment/Plan: The patient will go into a removal Air Cam Walker. She is going to begin a range of motion exercises on her own. She will remain non-weightbearing. I will see her in the office in 3 weeks, reexamine her, begin a weightbearing program after that visit, and also physical therapy program. The Cam Walker will remain 4 weeks after that visit.

**Dr. Jeffrey Baum, M.D., 9-17-03, (Tr. 317)**
Assessment/Plan: I reassured her that there is no redness, there is no drainage now, and the wound is completely healed. She has no pain there. I reassured her that everything was fine, and she will check back with Dr. Hasselman as planned, in about a month.

**Dr. Jeffrey Baum, M.D., 9-9-03, (Tr. 318)**
Assessment/Plan: I put her in a Cam Walker. She is going to do active range of motion of the ankle for the next month. I will see her back in about a month. At that time, I will make some decisions on weightbearing. I will probably let her go weightbearing as tolerated in the boot in one month.

**Dr. Carl Hasselman, M.D., 5-12-03, (Tr. 320)**
Plan: I still think she has an arthopathy or some type of inflammatory process going on. I am going to treat her with Bextra for a month, and we will see how things go. She is also going to get an MRI, and she is also going to bring me her old MRI. I am going to compare the MRIs of both her legs and then talk to her about her surgical options. I told her I would not operate on her Achilles tendon until I felt sure she had no significant inflammatory process going on. I will see how the Bextra works for her.

**Dr. Carl Hasselman, M.D., 3-4-03, (Tr. 325)**
Assessment/Plan: My assessment is that she clearly has some type of inflammatory condition causing some of the problems, along with her work-related condition. I am going to have her see a rheumatologist down in the West Virginia area to be evaluated and treated. Once he treats her and gets her inflamation more under control, I will proceed with maybe some surgical intervention. I will review the MRI one more time before I talk to her about surgery.

**DDS Physician, 12-20-04, (Tr. 331)**
Mental RFC Assessment
The MER and RFC rating shows the capacity to understand, remember, and carry out 1-3 step instructions within a low to moderate level of social interaction demand. The capacity for adaptation is as rated in Section I-D.

**DD Physician, 12-20-04, (Tr. 335)**
Psychiatric Review Technique
Mental Dispositions: RFC Assessment necessary
Categories upon which the medical disposition is based: affective disorders, anxiety-related disorders, somatoform disorders, personality disorders.
Affective Disorders: Depressive syndrome characterized by at least four of the following: appetite disturbance with change in weight, sleep disturbance, decreased energy, thoughts of

suicide.

Anxiety related disorders: Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress.

Somatoform disorders: Pain Disorder

Personality Disorder: Personality Disorder

Functional Limitations

     Restriction of Activities of Daily Living: Mild

     Difficulties in Maintaining Social Functioning: Mild

     Difficulties in Maintaining Concentration, Persistence or Pace: Moderate

     Episodes of Decompensation, Each of Extended Duration: None

**DDS Physician, 12-21-04, (Tr. 349)**

Physical RFC Assessment

Exertional Limitations

     Occasionally - 10 pounds

     Frequently - 15 pounds

     Stand and/or walk - at least 2 hours in an 8 hour workday

     Sit - about 6 hours in an 8 hour workday

     Push and/or pull - unlimited, other than as shown for lift and/or carry

Postural Limitations

     Occasionally: Climbing (ramp/stairs); balancing, stooping.

     Never: Climbing (ladder/rope/scaffolds), kneeling, crouching, crawling.

Manipulative Limitations: none established

Visual Limitations: none established

Communicative Limitations: none established

Environmental Limitations: Avoid concentrated exposure of hazards.

Symptoms: Obese patient with _____, all considered and RFC reduced to sedentary.

**Carl Hasselman, M.D., 12-12-05, (Tr. 369)**

Assessment/Plan: I am going to try some Lyrica to see if I can control her neuropathic pain. I will see her back in about 6 weeks to see how this is going. I gave her a refill for the Darvocet and Voltaren for the pain in her foot.

**Carl Hasselman, M.D., 1-4-05, (Tr. 376)**

Assessment/Plan: I really think she needs to go to the chronic pain clinic to try to get her more active. I do think she is very sincere in her problems.

D.    Testimonial Evidence

Testimony was taken at the January 3, 2006 hearing. The following portions of the

testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ATTORNEY] (Tr. 408)

Q        How far did you go in school?

A        Graduated high school, twelfth grade.

Q        Any vocational training?

A        Yes, I went to LPN school for a year.

                         *                    *                    *

Q        All right, are you married?

A        No.

Q        Do you live with anyone?

A        No.

Q        Do you have a driver's license?

A        Yes.

Q        How many miles do you drive a week?

A        Not many, unless I have to go to the doctor.  My doctor's in Pittsburgh, but that's once every two months or so I have to go to him.  Usually, two to five miles or so.

Q        Did you drive here today?

A        No.

Q        Do you drive yourself to the doctor, do you go to therapy?

A        Usually my dad takes me to my doctor's appointment and I'm not currently on physical therapy, but I've had physical therapy before.

                         *                    *                    *

Q        You indicated that you were last able to work in September of 2001, why did you pick that particular date as the date of your disability onset?

A    I re-injured my right Achilles tendon.

Q    Okay and when was the last time that you worked?

A    To tell you the honest truth, I don't really remember, it's been I know a couple of years.

Q    But, after you re-injured your tendon in 2001, you did go back to work?

A    The, the day, no, the day that I re-injured it I believe was the last day that I had worked, when I re-injured it.

Q    On your application, it indicates that you worked from May of '01 to August of '02 as an LPN, is that not the case?

A    Not sure, to tell you the honest truth - -

Q    Okay

A    - - I'm really bad with dates and everything.

Q    And it's been a long time - -

A    Yeah

Q    I'll review - -

A    So much has happened.

Q    - - I'll review the file to check that out.

A    I'm pretty sure that the last day I worked was the day that I injured it at Fairmont General Hospital.

Q    Okay

A    Was when I re-injured it.

Q    And you re-injured it in '01?

A        I believed it was.

Q        Okay - -

A        Was that '01 or '02?

ATTY:        Your Honor, I think it was September of '02.

CLMT:        Was it '02?

ALJ:        It was '02.  So would, would that be amending the onset date or would you still want it to remain as '01?

ATTY:        I would say the date of the re-injury.

ALJ:    And that's - -

ATTY:        [INAUDIBLE] when she last worked, September of '02.

ALJ:        September and that would be amended to 9, it's 25 here, does that make a difference?  If you have, let me see if I have it in my notes here.  I don't have the exact date of injury or re-injury here.

ATTY:        I could keep looking here, let's see.

ALJ:    Okay, but we'll - -

ATTY:        Make it 9/23/02.

ALJ:    9/23/02, the record - -

CLMT:        [INAUDIBLE]

ALJ:     - - should reflect that the onset date has been amended to 9/23 of '02.

[BY ADMINISTRATIVE LAW JUDGE]

Q        All right, if you could tell me in your own words what is it that keeps you from being able to work right now?

A       The pain in my Achilles tendon, my right and left Achilles tendon.

Q       Okay, you've worked as an LPN.  Could you briefly give us a description of your duties as an LPN and how much you had to lift in that job?

A       I would have to transfer patients from the bed to the chairs, from the bed to the bathroom, kind of things.  Help them with their activities of daily living, dress them, help bathe them, give them their medications and so most of the time the most weight I'd have to pick up was a person, so - -

Q       About how much pounds?

A       Usually they were anywhere from 100 pounds and up.

Q       Okay and how long did you do that type of work as an LPN, off and on?

A       Off and on I believe it was about three, four years.

                    *                    *                    *

Q       You say that you live alone in an apartment or house?

A       House.

Q       One or two stories?

A       Two, it has a basement.

Q       Do you do your own shopping?

A       Sometimes, yeah, most of the time.

Q       What about, and you, you do drive sometimes?

A       Uh-huh.

Q       Personal care, are you able to shower and, and dress yourself and that sort of thing?

A       Yes.

Q       Own cooking?

A       Yeah, as long as it's microwaveable.

Q       Have any hobbies that you do to keep you busy?

A       No, I used to do hobbies, but I don't anymore.

Q       Visiting with any friends or relatives?

A       No, usually just my mom and dad.

Q       Where do they live?

A       They live a couple of minutes away from me.

Q       Okay, any cleaning? House cleaning, that sort of thing.

A       Usually, no, I have a friend that helps me do some housework, but, you know, do
anything like dishes or something, I have to wash a few and sit down.

Q       So you can do some, but you have to take frequent breaks and sit?

A       Yes.

Q       Can you run the vacuum cleaner?

A       For a few minutes at a time, yeah.

Q       Make your bed and things like that?

A       Uh-huh.

Q       Do you play any games with friends or family?

A       Uh-huh.

Q       Watch TV?

A       I try to watch TV, but I lose my concentration and can't keep track of what's

going on and so I don't watch much.

Q       Do you take any trips with your family or friends?

A       No, I don't, I can't ride too long with periods of time.

Q       What interferes with your ability to ride?

A       My, just my legs start hurting, I either have to stretch them out or prop them up.

Q       How high do you have to prop your legs when you prop them up?

A       Usually the higher they, the higher the better it feels, but usually about six to eight inches.

Q       Do you have any form of exercises that you do at home?

A       No.

Q       Any walking, do you take walks?

A       No.

Q       Get any exercise at all?

A       Uh-huh, just want I do around the house or if I go to the grocery store, but I  - -

Q       How long can you sit without having to stand up?

A       Usually 20, 30 minutes or so.

Q       How long can you stand up without having to sit down?

A       About two, three minutes, I either have to stand one foot up or one down or find someplace to sit.

Q       When you walk do you use a cane?

A       No.

Q       What do you do to relieve discomfort, when you - -

A        I take pain medication and I usually, you know, prop my feet up or soak them in hot water. I've put ice sometimes, ice helps, but it's kind of hard to use.

Q        What is your pain level like on a good day and on a bad day?

A        I'm never completely pain free, but on a good day on a scale of one to ten, it's almost a four.

Q        And on a bad day?

A        A bad day, it's been ten and over and I've even had to go to the emergency room for the pain.

Q        What, how many good days you do have a week compared to bad days?

A        Not too many, I'd say just a couple.

Q        Couple of what?

A        Couple of days a week.

Q        Good or bad?

A        Good, it's never good all day long. I usually have pretty bad pain, some period throughout the day.

Q        If you had to pick up something sitting by your chair there and lift it and carry it across the room, how much do you think you could pick up?

A        Probably about 20 pounds or so, but I could only take it a couple of steps and then I'd have to sit it down, either - -

Q        Okay.

A        - - scoot or pull it?

Q        Do you do your laundry?

A No, ma'am.

Q Who does your laundry?

A Friends.

Q What about pets, do you have any pets that you care for?

A Yes, ma'am, I have dogs.

Q How many?

A Two.

Q Who takes care of the dogs?

A I do, basically.

*  *  *

[EXAMINATION OF CLAIMANT BY ATTORNEY] (Tr. 417)

Q Okay, now you've mentioned, how many total surgeries have you had?

A I've had three to my right foot and one to my left foot.

Q Have you had any improvement with any of the surgeries?

A The one surgery where he cut the nerve, I had an improvement for like four days, but then after that it just went back to the way it was, but other than that, there's been no improvement.

*  *  *

Q Now, as far as the future, do they recommend any treatment for your feet?

A My doctor would like to do a nerve stimulator in my foot, but there's been kind of a mix up with that.  They somehow got it mixed up to be a spinal cord stimulator and that's not what they wanted to do, but - -

Q    By they who are you referring to?

A    Worker's compensation.

Q    Okay,

A    But my doctor would like to put a nerve stimulator in, he's had a lot of success with that.

Q    Now you had mentioned that you do prop your feet up throughout the day?

A    Uh-huh.

Q    About how many total hours per day do you need to prop your feet up?

A    Anywhere probably from six to eight hours or so a day. I'm either sitting, or propping them up, or laying down, or - -

Q    Okay, what happens if you aren't able to prop your feet up for that amount of time?

A    My feet swell and start hurting really bad.

Q    And also earlier in the testimony you said that there is never a day where you're pain free all day long when having a good day all day long. And then you also rated your pain at it's worse at a ten, so about how many total hours of the day would you say your pain is worse?

A    Anywhere from three to five hours a day, it's varies.

Q    Do you find that pain affects your ability to concentrate or your memory?

A    Yes.

Q    How so and could you please say examples?

A    Well, I could be talking to you and get a sharp pain in it and then forget what I was talking about and be then start talking about something else or you know I just can't keep

track of things.  I had to close my checking account because I can't do numbers or bills or anything like that, I just, it just makes me real anxious and upset.

Q       Have the doctors ever discussed any future surgeries with you other than the nerve stimulator or other treatments?

A       No, just the never stimulator and the, what is that, that new medicine that Lyrica, do it for like the nerve ending pain surgeries now.

*               *               *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ] (Tr. 422)

Q       All right.  If you could imagine, a hypothetical person of Ms. Gordon's age, background, work experience, education.  Who can do a range of sedentary work with the following limitations: A need to prop her feet six to eight inches when sitting, needs to avoid extreme cold and heat, vibrations, fumes, odors, gases, such as that.  No climbing of ropes, ladders, scaffold.  No hazardous machinery or lights.  No kneeling crouching or crawling, but other postural occasionally.  She needs a low stress environment and by that I mean an entry level, unskilled, simple instruction, routine and repetitive, no production line type work, things rather than people, and little or no contact with the public.  Would such a hypothetical person be able to do Ms. Gordon's prior relevant work?

A       No, Your Honor.  Her jobs both, the LPN and sales clerk, exceed the exertional level plus they deal with people.

Q       All right, are there any jobs in the economy that she would be able to perform?

A       With the limitations indicated in your hypothetical, yes there would be some jobs. There would be the surveillance system monitors, 50 in the local labor market, 15, 000 nation.

19

There are also addressers, 250 local, 100,000 nation. There are laundry pricing clerks, 50 local, 15,000 nation. And there are inspector/checkers of small products, 150 local, 20,000 nation. These are all sedentary jobs that would comply with your hypothetical limitations.

Q        All right, if the person in any of these jobs were off task greater than ten percent of the time, due to pain, lack of concentration, persistence or pace, would they be able to sustain employment?

A        On a sustained basis, no, Your Honor. Although, my understanding and experience has indicated that the bottom line for most employees in unskilled work is 85 percent productivity so it would be greater than, if it's great then 15 percent on a regular basis they would not be able to do the jobs.

Q        If greater than 15 percent?

A        Right, between, they want 85 to 90 percent productivity.

Q        Okay, so let's say between, if it's greater than ten percent, ten to 15 percent, no jobs.

A        Right.

Q        Is your testimony consistent with the DOT?

A        Yes, Your Honor, it is.

*          *          *

E.        <u>Lifestyle Evidence</u>

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

- Dusts furniture.  (Tr. 99)

- Takes out the trash.  (Tr. 99)

- Difficulty going down the stairs.  (Tr. 99)

- Paints ceramics once every two weeks.  (Tr. 100)

- Drives 2-5 miles per week.  (Tr. 408)

- Drives to the doctor's in Pittsburgh once every two months.  (Tr. 408)

- Does her own shopping for food and medication.  (Tr. 100, 413)

- Showers and dresses herself.  (Tr. 413)

- Cooks microwaveable food.  (Tr. 413)

- Visits mother and father who live a couple of minutes away.  (Tr. 413)

- Washes a few dishes at a time.  (Tr. 99, 413)

- Runs the vacuum cleaner for a few minutes at a time.  (Tr. 413)

- Makes her bed.  (Tr. 413)

- Plays games with friends or family.  (Tr. 413)

- Tries to watch television.  (Tr. 414)

- Goes to the grocery store.  (Tr. 414)

- Takes care of two dogs.  (Tr. 414)

- Is 5'6" in height and weighs 290 pounds.  (Tr. 407)

### III.  The Motions for Summary Judgment

A.      <u>Contentions of the Parties</u>

Claimant contends the ALJ erred in concluding her achilles heel impairment did not meet the impairment listed at 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.03. Claimant also contends the ALJ failed to properly consider the impact of her pain when determining her RFC and failed to list all her impairments in the hypothetical posed to the Vocational Expert, ["VE"]. Claimant lastly argues that if this Court does not grant her Motion for Summary Judgement, her case should be remanded to the ALJ for consideration o f new evidence.

Commissioner responds that the ALJ properly determined Claimant's impairment did not meet or equal the impairments listed at 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.03, properly determined Claimant's RFC and posed an accurate hypothetical to the ALJ. Commissioner also contends that this Court should not remand Claimant's case based on "new evidence," as the allegedly new evidence submitted by Claimant is neither "new" nor "material."

B.    The Standards.

1.    Summary Judgment. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

256 (1986).

2.    Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See, 42 U.S.C. §§ 405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.    Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that he has a medically determinable impairment that is so severe that it prevents him from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. §§ 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.    Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. §§ 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.    Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that he was disabled before the expiration of his insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.    Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.    <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The

Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently

explained his rationale in crediting certain evidence in conducting the "substantial evidence

inquiry." <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot

determine if findings are unsupported by substantial evidence unless the Secretary explicitly

indicates the weight given to all of the relevant evidence.  <u>Gordon v. Schweiker</u>, 725 F.2d 231,

235-36 (4th Cir. 1984).

8.    <u>Social Security - Substantial Evidence - Defined</u>.  Substantial evidence is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat

less than a preponderance.  <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.    <u>Social Security - Sequential Analysis</u>.  To determine whether Claimant is

disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920,

and determine: 1) whether claimant is currently employed, 2) whether she has a severe

impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether

the claimant can perform her past work; and 5) whether the claimant is capable of performing

any work in the national economy.  Once claimant satisfies Steps One and Two, she will

automatically be found disabled if she suffers from a listed impairment.  If the claimant does not

have listed impairments but cannot perform his past work, the burden shifts to the Secretary to

show that the claimant can perform some other job.  <u>Rhoderick v. Heckler</u>, 737 F.2d 714-15 (7th

Cir. 1984).

C.    <u>Discussion</u>

1.      Whether the ALJ Erred In Concluding Claimant's Impairment Did Not Meet
        Listing 1.03.

Claimant argues the ALJ erred in concluding that Claimant's achilles heel impairment did not meet the criteria of the muskuloskeletal impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.03, "Reconstructive surgery or surgical arthrodesis of a major weight bearing joint." Commissioner responds that the ALJ properly concluded Claimant's achilles heal impairment did not meet the criteria of listing1.03 because the evidence did not support a finding Claimant was unable to ambulate effectively for a period of twelve months.

At step three of the sequential analysis, the ALJ must determine whether any of a claimant's impairments meet or equal the impairments listed in 20 C.F.R. pt. 404, subpt. P, app. 1. SSR 86-6. A finding that a claimant's impairment meets or equals a Listing in Appendix 1 results in a determination of disability without the need for further review, as the impairments listed in Appendix 1 "would ordinarily prevent an individual from engaging in any gainful activity." Id. The claimant bears the burden of proving that their impairment meets all - not merely some - of the requirements of a listed impairment. Fleming v. Barnhart, 284 F. Supp. 2d 256, 269 (D.Md. 2003); see, also, Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995). In order for the reviewing court to determine if the Secretary based the agency's decision on substantial evidence, the ALJ's decision must include the reasons for the determination that an impairment does not meet a listed impairment. Cooks v. Heckler, 783 F.2d 1168, 1172 (4th Cir. 1986).

Listing 1.03, a musculoskeletal impairment, describes the following impairment: "Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset." 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.03.

Section 1.00(F) notes that the "ankle-foot" is a major joint.  Id. at § 1.00(F).  Section 1.00B2b(1)

defines the "inability to ambulate effectively" as "an extreme limitation of the ability to walk;

i.e., an impairment(s) that interferes very seriously with the individual's ability to independently

initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having

insufficient lower extremity functioning to permit independent ambulation without the use of a

hand-held assistive device(s) that limits the functioning of both upper extremities."  Id. at § 1.00.

Section 1.00B2b(2) provides "individuals must be capable of sustaining a reasonable walking

pace over a sufficient distance to be able to carry out activities of daily living."  Id.

       The ALJ in the present case concluded Claimant suffered from the following severe

impairments: status post bilateral Achilles tendon repair; obesity; mood disorder; posttraumatic

stress disorder; pain disorder; and personality disorder.  (Tr. 18).  Although the ALJ

acknowledged that Claimant suffered multiple injuries to her achilles heel/ankle region and

underwent four surgeries to this area between 2000 and 2004 - and thus met the threshold

qualification of Listing 1.03 - the ALJ concluded that Claimant's "achilles tendon condition with

neuropathic pain is not attended by clinical findings" to satisfy the requirements of section 1.00

(which includes Listing 1.03).  (Tr. 20-25, 167, 168, 310-12).  This Court finds the ALJ's latter

determination is supported by substantial evidence because there is substantial evidence that

Claimant's ability to ambulate effectively was not impaired for any twelve month period.

Furthermore, this Court finds the ALJ complied with the mandate of Heckler by detailing - albeit

in the section discussing Claimant's RFC - her reasons for concluding as she did.[9]  See Heckler,

_____

       [9] In her statement that Claimant did not meet a Listing, the ALJ noted that support for her
conclusion was "detailed in the discussion of the medical evidence in the claimant's case."  (Tr.
20).  Looking "below" to the ALJ's discussion of Claimant's RFC and ability to work, it is

783 F.2d at 1172.

As accurately noted by the ALJ, numerous treating physicians documented Claimant's retained mobility and ability to ambulate throughout the disability period. (Tr. 23, 24). For example, as early as two days after her second injury in September 2001, Dr. Thrush gave Claimant a back-to-work slip for October 4th. (Tr. 168). Similarly, although Dr. Thrush noted in September 2002 that Claimant had a "shuffling gait," he did not otherwise specify that Claimant was unable to ambulate effectively. (Tr. 167). Likewise, Claimant's treating physician, Dr. Hasselmen, concluded after performing surgery on Claimant's feet in Fall 2003 that Claimant was "doing extremely well at this point and has responded well to all treatments thus far." (Tr. 315). Like Dr. Thrush, he at no point concluded Claimant was unable to ambulate effectively. Rather, he merely referred Claimant to a rheumatoligist to determine whether Claimant suffered from an inflammatory disorder. (Tr.320). Finally, although Claimant underwent surgery in January 2004 and was given a boot to wear as well as instructions that she must refrain from weightbearing activities for six weeks, Dr. Thimmappa performed a consultative examination on Claimant in June 2004 and noted that Claimant walked with a normal gait and that her joint movements were normal. (Tr. 25). Overall, the reports from Claimant's treating physicians failed to establish that Claimant was unable to effectively ambulate for a twelve month period, as required by Listing 1.03.

Multiple DDS physicians also established support for the ALJ's conclusion that

_____

evident the ALJ underwent a detailed analysis of the evidence, including how Claimant's impairment impacted her ability to ambulate. (Tr. 22-26). While this Court believes it would have been more effective for the ALJ to include mention of such evidence in the section pertaining to Listings, (as opposed to RFC), this Court finds the ALJ met the requirement of Cook by sufficiently detailing the reasoning behind her conclusions.

Claimant's achilles heel impairment did not sufficiently impair her ability to ambulate so as to meet Listing 1.03. For example, all four DDS physicians who assessed Claimant's Physical RFC - on March 2003, April 2003, August 2004 and December 2004 - concluded Claimant retained the ability to perform a range of sedentary to light labor. (Tr. 196, 218, 268, 349). While each physician placed mild limitations on Claimant's ability to lift, stand, walk and sit, none of them noted that Claimant was unable to ambulate effectively for the purposes of working. To the contrary, each physician agreed that Claimant was capable of standing/walking for at least 2 hours in an 8 hour day. (Tr. 196, 218, 268, 349). Additionally, while the DDS physician in March 2003 noted that Claimant recovered from her ankle injuries with a "residual shuffling gait," he did not otherwise note that Claimant was unable to ambulate effectively. (Tr. 201). Similarly, the DDS Physician on the August 2004 report concluded that Claimant "is now walking with a normal gait; full range of motion; no problems with ambulation." (Tr. 268).

Finally, as noted by the ALJ, Claimant's lifestyle evidence contradicts assertions by the Claimant that her pain limited her ability work and ambulate effectively. (Tr. 25). Not only could Claimant ambulate effectively at the hearing without the use of a cane or other assistive device as described in Section 1.00B2b(1), Claimant retained the ability to drive a car, shop for groceries, visit her parents, do her own personal care, care for her pets, cook, vacuum, and lift and carry twenty pounds. (Tr. 25, 406-424). While Claimant's testimony established that she performed the above activities with pain, there is substantial evidence that she nonetheless retained the ability to "ambulate effectively" as imagined by Listing 1.03 and therefore did not meet the requirements of Listing 1.03. (Tr. 415).

Based on the foregoing evidence, this Court finds there is substantial evidence in the

record to support the ALJ's conclusion that Claimant did not meet the requirements of Listing 1.03, as there is no evidence Claimant was unable to ambulate effectively for a duration of twelve months.

      2.      <u>Whether the ALJ Erred in Determining Claimant's RFC and Provided a Faulty Hypothetical to the VE.</u>

Claimant argues the ALJ erred in determining Claimant's Residual Functional Capacity, ["RFC"] by improperly discrediting her subjective symptoms of pain arising from her achilles heels. Claimant also contends the hypothetical posed to the VE did not account for all of Claimant's limitations. Commissioner contends that the ALJ properly determined Claimant's RFC, (properly considering only those limitations and symptoms that were consistent with the medical evidence), and posed a proper hypothetical to the VE.

After a claimant has met their burden of showing they are not able to perform their past relevant work, the burden shifts to the Commissioner to show that the claimant is capable of performing a significant number of jobs in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572 (4th Cir. 1976). Prior to such a showing, the ALJ must determine the claimant's RFC and must also note the claimant's age, education and work experience. 20 C.F.R. §§ 404.1520, 404.1545. The RFC is a determination of the most a claimant can do despite her limitations. 20 C.F.R. § 404.1545. A claimant's RFC is to be determined only after the ALJ has considered all the relevant medical evidence of the claimant's impairments as well as descriptions of symptoms (such as pain). <u>Id.</u> at § 404.1529(a); <u>see, also</u>, <u>Hines v. Barnhart</u>, 453 F.3d 559, 563 (4th Cir. 2006).

The ALJ in the present case determined Claimant was capable of performing a range of

sedentary work with the following limitations: "A need to prop her feet six to eight inches when sitting, needs to avoid extreme cold and heat, vibrations, fumes, odors, gases, such as that. No climbing of ropes, ladders, scaffolds. No hazardous machinery or lights. No kneeling, crouching or crawling, but other postural occasionally. She needs a low stress environment and by that I mean an entry level, unskilled, simple instruction, routine and repetitive, no production line type work, things rather than people, and little or no contact with the public." (Tr. 423). Before determining Claimant's RFC, the ALJ considered the impact, if any, of Claimant's alleged achilles heel pain on her ability to work. (Tr. 25). The ALJ concluded that while Claimant suffered from an impairment in her achilles heel that could reasonably give rise to pain, Claimant's statements as to the intensity, duration and limiting effects of the pain were not supported by the medical evidence and as such were not credible. (Tr. 23, 25). Claimant argues the ALJ's analysis of her pain failed to comply with the requirements of Hines. Specifically, Claimant agues the ALJ was obligated to fully credit the degree of pain and limiting effect alleged by Claimant once concluding that the medical evidence supported the existence of an impairment that could give rise to pain. This Court disagrees with Claimant's proposed interpretation of Hines.

The Court, in Hines, set forth a two-step procedure an ALJ must follow when determining whether and to what degree a claimant's subjective pain impairs their ability to work. First, the ALJ must examine the objective medical evidence and determine whether a claimant suffers from a medically determinable impairment that could cause pain. Hines, 453 F.3d at 564; see, also, SSR 96-7p (1996). Second, assuming the ALJ concludes the claimant does suffer from such an impairment, the ALJ must evaluate how the pain arising from the

30

impairment limits the claimant's ability to work.  Hines, 453 F.3d at 564.  In this second step, the claimant "is entitled to rely exclusively on subjective evidence to prove . . . that his pain is so continuous and/or severe that it prevents him from working a full eight hour day."  Id. at 565.  Contrary to Claimant's understanding, this does not mean the ALJ is forbidden from discrediting a claimant's subjective evidence to the extent it is inconsistent with objective medical evidence or to the extent to which the impairment cannot reasonably be expected to cause the degree of pain claimant alleges.  Id., relying on Craig, 76 F.3d at 595.  The Court in Hines intended only to establish that a "claimant's allegations about [his] pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or the severity.  Hines, 453 F.3d at 565, fn.3.

After a review of the ALJ's decision in the present case, this Court finds the ALJ complied with the two-part analysis set forth in Hines.  As required by "step one" of the Hines analysis, the ALJ reviewed the objective medical evidence and concluded Claimant suffered from an impairment that could reasonably cause pain.  (Tr. 23, 25).  Such a conclusion was proper given the medical evidence documenting Claimant's multiple injuries and surgeries in her achilles heel area as well as the various treatments Claimant received for her pain.  (See, e.g., Tr.168, 305, 310-11).

As required under "step two" of the Hines analysis, the ALJ next set out to determine how the pain arising from Claimant's achilles heel impairment impaired her ability to work.  In accordance with Hines, the ALJ considered Claimant's subjective evidence (including her testimony at the hearing) as well as the objective medical evidence.  (Tr. 23-25).  The ALJ then concluded there existed an inconsistency between the objective and subjective evidence such

that the degree of Claimant's pain was not credible. (Tr. 23-25). This Court finds the ALJ's conclusion is supported by substantial evidence, as the record established Claimant experienced pain, but not a disabling degree of pain. Unlike in <u>Hines</u> wherein a physician concluded Mr. Hines' pain prevented him from working, Claimant's treating physician noted her consistent pain but did not otherwise conclude the pain prevented her from working. <u>See</u> <u>Hines</u>, 453 F.3d at 555-56. Similarly, although Claimant testified that "she was never pain free, . . . that she had a couple of good days per week, but that it was never good all day long and that she usually had pretty bad pain some time during the day," DDS physicians concluded Claimant was able to perform sedentary to light work. (Tr. 196, 218, 268, 349, 415).

For the above mentioned reasons, this Court finds the ALJ's determination of Claimant's RFC was proper. This Court also finds that pursuant to <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990) and SSR 96-5p (1996), the ALJ's hypothetical to the Vocational Expert properly accounted for all of Claimant's limitations found to be supported by the record. As the ALJ reasonably concluded the duration, intensity and limiting effects of Claimant's pain were not credible, the ALJ properly excluded from the hypothetical any requirements accommodating such symptoms of pain, such as Claimant's alleged need to prop her feet up for six to eight hours per day.

       3.      <u>Whether the Case Should Be Remanded for Consideration of New Evidence</u>

Claimant asks that in the event this Court denies her Motion for Summary Judgement, this Court remand the matter to the ALJ for consideration of newly presented evidence. Commissioner contends that pursuant to section 83.12(d) of the Local Rules of General Practice and Procedure for the United States District Court for the Northern District of West Virginia,

["LR Gen P"], Claimant should not be permitted to submit further evidence after previously "submitting" her case. Commissioner also contends that the new evidence does not warrant a remand, as it is not "new," "material," nor submitted with "good cause."

This Court agrees with Commissioner that LR Gen P 83.12(d) bars Claimant from submitting new evidence after June 12, 2007. Pursuant to LR Gen P 83.12(d), which governs the practice and procedure for social security appeals, "the case shall be deemed submitted as of the date on which the defendant's reply brief is filed." As Commissioner filed his reply brief on June 12, 2007, the case was effectively "submitted" on June 12, 2007 for the purposes of Claimant's appeal. The new evidence filed by Claimant on July 12, 2007 was therefore filed after the case had been submitted and should not be considered. In the event the District Court disagrees with this conclusion, this Court has examined the new evidence and concludes it does not warrant a remand.

For this Court to order remand based on additional evidence, Claimant must present new and material evidence the ALJ did not have available at the prior proceedings. 42 U.S.C. § 405(g). Claimant must also present good cause for the failure to incorporate the evidence at the prior proceeding. Id. As the Fourth Circuit stated, "The district court may only order additional evidence to be taken before the Commissioner upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence in a prior proceeding." Smith v. Chater, 99 F.3d 635, 638 n.5 (4th Cir. 1996). The Fourth Circuit has held that evidence is new "if it is not duplicative or cumulative." Wilkins v. Sec'y, Dep't of Health and Human Servs., 953 F.2d 93, 96 (4th Cir. 1991). A piece of evidence "is material if there is a reasonably possibility that the new evidence would have changed the outcome." Id.

Additionally, evidence must bear "on the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b). Simply because the evidence must bear on the period on or before the ALJ's decision does not mean it must have existed at that time. Woolridge v. Bowen, 816 F.2d 157, 160 (4th Cir. 1987). As long as the evidence relates to whether Claimant had a disability during the relevant time period, the Court should consider it. Id.

Dr. Osial's report dated March 2007 is "new" evidence because it presents a fresh perspective as to whether Claimant suffered from an inflammatory disease. Wilkins, 953 F.2d at 96. However, the report is not relevant to the period of Claimant's disability - September 2001 through February 2006 - because Claimant's condition at the time of her visit to Dr. Osial was substantially worse than her condition throughout the disability period. As Dr. Osial explained, Claimant "reports that her clinical course was fairly stable for the next several years with low back pain and some occasional right shoulder discomfort also. She said the course changed, however, 6 to 8 months ago when she developed significant articular pain." (Dr. Osial's report, at page 1). Dr. Osial later noted that "the dilemma here is that with the Achilles ruptures she had some low grade discomfort including back pain but more recently the course has changed." (Dr. Osial's report, at page 4). Even if this Court were persuaded that Dr. Osial's report pertained to the relevant time period, this Court finds the evidence is not materia because there is not a reasonable possibility the evidence would have changed the outcome at the hearing. Wilkins, 953 F.2d at 96. Aside from reaffirming that Claimant suffers from a history of "achilles ruptures bilaterally," the report failed to provide any evidence of the degree to which Claimant's pain effected her ability to ambulate effectively or her ability to complete work-related tasks. Dr.

Osial merely raised the possibility that Claimant suffered from inflammatory arthritis but did not discuss how such a disease impacted Claimant's ability to walk or work.

Dr. Gerbo's report dated March 2007 is "new" evidence to the extent it provides further descriptions of Claimant's history of pain. Wilkins, 953 F.2d at 96. Out of recognition of the importance of the ALJ having all the evidence before her, this Court finds the evidence is relevant to the period of disability. Although there is no way to assure the symptoms alleged by Claimant to Dr. Gerbo in March 2007 were experienced by Claimant during the period of disability, the report does include summaries of Claimant's treatment received during the disability period and as such is arguably relevant to the disability period. This Court holds the report is not material because it does not contain information that would reasonably change the ALJ's decision. Wilkins, 953 F.2d at 96. Rather, the report documents that Claimant's strength is normal and symmetric throughout her lower extremities and that Claimant reports no worsening in injuries with strength testing of ankle flexion and extension. While the report did note Claimant walked with a mild right-sided limp, the ALJ was already aware that Claimant's gait was effected by her injuries. Lastly, Dr. Gerbo implicitly affirmed the ALJ's determination of Claimant's ability to work because Dr. Gerbo declined to challenge or take issue with the recommendation from a previous FCE that Claimant could perform at the medium physical demand level.

Finally, Dr. Kafka's report dated May 2007 presents "new" evidence of Claimant's possible diagnosis of lupus. However, like Dr. Gerbo's report, Dr. Kafka's report is not relevant to the alleged period of disability. The report not only indicates that Claimant experienced an "'escalation" in her symptoms on or about May 2006 - more than three months after the close of

the alleged period of disability - but also establishes that Claimant's arthritic pain was relieved by taking Methotrexate, a drug Claimant was not taking during her disability period. (Tr. 155; Dr. Kafka's report, at page 1, 5). This Court also finds that the report is not material, as the report does not contain any evidence of Claimant's limited ability to ambulate or work. To the contrary, the report documents Claimant retains a good range of motion throughout her body and notes that "synovitis" (inflammation of the lining of the joints) was not present in Claimant's ankles. (Dr. Kafka's report, at page 5). While this Court does not take lightly the fact that Dr. Kafka concluded Claimant "likely does have underlying Lupus with mainly arthritis as her main feature," such a conclusion is not material to the ALJ's decision without evidence of how Lupus bears on Claimant's pain or limitations.

For the aforementioned reasons, the Court concludes the new evidence submitted by Claimant is not material to the ALJ's decision and as such does not call for a remand of this matter.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1. Claimant's Motion for Summary Judgment be DENIED.

2. Commissioner's Motion for Summary Judgment be GRANTED. First, the ALJ's decision that Claimant's achilles heel impairment did not meet Listing 1.03 is supported by substantial evidence in the record. As established by the evidence, Claimant suffered injuries to her achilles heel but was not otherwise unable to ambulate effectively for a period of 12 months. Second, the ALJ properly determined Claimant's RFC after complying with the two-step process set forth in Hines and after considering the degree to which Claimant's subjective symptoms

were consistent with the medical evidence.  Finally, the ALJ's hypothetical presented to the ALJ properly contained all those limitations supported by the medical evidence.

      3.      Claimant's Motion for Remand be DENIED.  Although LP Gen P 83.12(d) bars the introduction of the new evidence submitted by Claimant, this Court - if asked to evaluate the evidence - concludes Claimant had "good cause" for failing to submit the evidence at the time of the prior proceeding and that the reports presented "new" evidence.  However, this Court also finds that the reports were not "material," as there was not a reasonable possibility the reports would have changed the outcome at the hearing.

      Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: September 12, 2007

                     /s/ James E. Seibert
                     JAMES E. SEIBERT
                     UNITED STATES MAGISTRATE JUDGE